UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| BRANDY SANCHEZ, | ) | |
| (Social Security No. XXX-XX-2284), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:07-cv-164-WGH-RLY |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 10, 21) and an Order of Reference entered by District Judge Richard L. Young on March 4, 2009.  (Docket No. 22).

### I.  Statement of the Case

Plaintiff, Brandy Sanchez, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") or Social Security Income ("SSI") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. § 404.1520(f).  The court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff initially applied for DIB on November 1, 2001, alleging that her disability began on October 29, 2001. (R. 45-47). The agency denied Plaintiff's application on April 1, 2002, and Plaintiff never appealed that decision. (R. 34-36).

Plaintiff again applied for DIB, and also SSI, in March and April 2004, alleging disability since October 30, 2001.[1] (R. 48-50, 81). The agency denied Plaintiff's application both initially and on reconsideration. (R. 31-32, 38-42). Plaintiff appeared and testified at a hearing before Administrative Law Judge George Jacobs ("ALJ") on November 9, 2006. (R. 484-516). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 484). On June 10, 2007, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 16-24). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 5-7). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on November 16, 2007, seeking judicial review of the ALJ's decision.

---

[1]Plaintiff was only insured for DIB through June 30, 2003. (R. 16). Because Plaintiff never appealed the April 1, 2002 decision, she is precluded from arguing that she is entitled to DIB or SSI on or before April 1, 2002, but must demonstrate, for DIB purposes, that she was disabled before June 30, 2003.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 30 years old at the time of the ALJ's decision and had at least a high school education.  (R. 22).  Her past relevant work experience was that of a housekeeper, a grocery store clerk, a day care worker, and a plastic press molder; each of these jobs were light unskilled or semi-skilled jobs.  (R. 22).

### B.  Medical Evidence

#### 1.  Back Pain

An MRI of Plaintiff's lumbar spine conducted April 21, 2000, showed a large central disc herniation at L4-5 with an extruded fragment extending inferiorly in the left lateral location to the inferior aspect of L5 lateral recess causing overall moderate stenosis of the central canal as well as significant compression of the left L5 root; a new central herniation at L5-S1 without compromise to the central canal; and a posterior annular tear at L3-4 with an overall mild central stenosis and associated diffuse disc bulge.  (R. 221-22).

On April 14, 2004, Plaintiff presented to the emergency room ("ER") with back pain; she reported numbness, tingling, and paresthesias extending down her leg with multiple previous episodes.  (R. 373-74).  She reported that back surgery was recommended when she was able to lose weight.  (R. 373).  Gregory W. Moore, M.D., opined that Plaintiff suffered from radiculopathy.  (R. 374).

In October 2004, Plaintiff sought three weeks of treatment for back pain. (R. 397-99). Plaintiff was prescribed Celebrex and advised to lose weight. (R. 398).

In December 2005, Plaintiff sought ER treatment for low back and flank pain of three days duration. (R. 464). The ER physician diagnosed a urinary tract infection. (*Id.*) On examination, Plaintiff sat comfortably, had no shortness of breath, and had no neurologic deficits. The doctor noted that Plaintiff tested positive for cannabinoids and, although she reported she did not smoke, had cigarettes in her purse. (*Id.*)

### 2. Asthma/Breathing Difficulties

On September 5, 2001, Plaintiff presented to Kyle O. Rapp, M.D., for worsening of shortness of breath and wheezing. (R. 274-75). She reported using her nebulizer three times a day. (R. 274). Dr. Rapp diagnosed bronchitis and administered an Albuterol treatment which resulted in opening her lungs up somewhat. She was prescribed Duratuss and instructed to return in one to two weeks. (R. 275).

In November 2001, Plaintiff reported to her clinician that she smoked one pack of cigarettes per day. (R. 232).

On June 23, 2003, Plaintiff presented to the ER with shortness of breath. (R. 387-88). She reported that she was a non-smoker. (R. 387). David Brewer, M.D., administered three asthma treatments, and Plaintiff was released breathing better; she was instructed to avoid cigarette smoke. (R. 388).

On December 9, 2003, Plaintiff sought ER treatment for acute pharyngitis following a strep infection.  (R. 295-98).  Later that month, Plaintiff received about six days of in-patient treatment, after admission through the ER, for an exacerbation of asthma and pneumonia following a strep infection.  (R. 328-41). Plaintiff was using her nebulizers about five times a day.  (R. 328).  Plaintiff reported a ten-year history of smoking and reported that she last smoked one pack a day six months prior to her current illness.  (R. 328, 337).  However, her treating physicians assessed that she was using tobacco and noted she expressed a desire to quit smoking.  (R. 328, 339).

In late January 2006, Plaintiff sought ER treatment for abdominal pain; the ER doctor prescribed medication for bronchitis.  (R. 454-58).

### 3.  Sleep Apnea

Plaintiff underwent an overnight Sleep Study on March 2, 2006.  (R. 467-68).  The study revealed very severe obstructive sleep apnea with an apnea hypopnea index of 105 per hour of sleep with oxygen desaturations down to 48%.  (R. 467).  A CPAP study was conducted on March 23, 2006, and Plaintiff's apnea hypopnea was reduced to 2.7 per hour of sleep; oxygen saturation was well maintained.  (R. 468).  Plaintiff was prescribed a CPAP machine.  However, she would not wear the CPAP because she thought that the pressure was too high.  (*Id.*)  Arthur Bentsen, M.D., indicated that Plaintiff really needed to use the CPAP machine, and that they would make an effort to decrease the pressure. (*Id.*)

### 4.  Mental Health Treatment

On August 22, 2002, Plaintiff was seen by Norma J. Will, M.D., during a postpartum visit.  (R. 257).  Plaintiff discussed her feelings of depression, she expressed some suicidal ideations, but denied having a plan or a desire to harm her children, and she was agreeable to a psychiatric evaluation and antidepressant medication.  (*Id.*)

Between January and March 2003, Plaintiff received counseling services from Southwestern Indiana Mental Health Center, Inc., on referral from her primary physician, Dr. Will.  (R. 425-29).  Plaintiff exhibited symptoms of depressed and anxious mood and reported mood swings causing stress in her household.  (R. 428).  The social worker who evaluated Plaintiff noted difficulties with interpersonal relationships and economic problems.  (R. 428-29).  The social worker recommended a psychiatric evaluation and provided counseling services through March 2003, but closed Plaintiff's case after she failed to return calls.  (R. 425-29).

Between January 2005 and September 2006, Plaintiff received counseling at Southwestern Indiana Mental Health Center for problems with depression and anger management.  (R. 423-24, 437-52).  Plaintiff reported difficulty with depression and anger management, with worrisomeness and anger over family, relationships, and financial problems.  (R. 423).  Plaintiff was counseled on these issues, and her mental status was stable throughout her therapy.  (R. 412-18, 421-23, 437-52).

-6-

In March 2005, psychiatrist John Wuertz, M.D., of Southwestern Indiana Mental Health Center, evaluated Plaintiff.  (R. 419-20).  Plaintiff reported problems with anger and depression; she complained of disrupted sleep, feelings of worthlessness, and crying easily, but said her concentration was okay.  (R. 419).  Plaintiff also reported being sexually abused by her mother's boyfriends and her uncle when she was a child; she also witnessed her brother being shot and killed when he was 13.  (*Id.*)  Dr. Wuertz found Plaintiff was oriented and had appropriate affect, logical and relevant thoughts, intact recent and remote memory, average intellect, and fair insight and judgment.  (R. 420).  Dr. Wuertz assessed dysthymic disorder and post-traumatic stress disorder, rule out major depressive disorder.  He assessed Plaintiff's current GAF as 50.[2]  Dr. Wuertz prescribed Zoloft and advised a six week follow-up.

In October 2005, Plaintiff told her therapist of difficulty sleeping following separation from her husband due to housing problems.  (R. 452).  Her therapist assessed her mental status as stable and discussed availability of community resources for child care, housing, and food stamps.  (R. 451-52).

In November 2005, Dr. Wuertz noted Plaintiff was taking Paxil without any side effects; a six week follow-up was advised.  (R. 449).  The next month, Plaintiff reported the medication was helping her anger.  (R. 448).

---

[2]A GAF between 41 and 50 is indicative of serious symptoms or impairment in functioning.  *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., text rev. 2000).

In January 2006, Plaintiff talked about her pain levels and thought she had symptoms of depression. (R. 446). At her next visit, the therapist reviewed behavioral coping for depressed mood. (R. 443). Plaintiff's therapist thereafter continued to assess her mental status as stable and low risk (R. 436, 438, 440, 443, 445-46, 448), and continued to assist with social services for issues such as housing, divorce, and family stressors (R. 436, 438, 440, 443, 445). She noted Plaintiff relied on friends and family to make decisions. (R. 443).

In February 2006, and again in August 2006, Dr. Wuertz noted Plaintiff had family and medical stressors and increased her Paxil dosage. (R. 437, 442).

### 5. Plaintiff's Physical Exams

Around July 2002, Plaintiff gave birth; at her post-partum visit, sensory, motor, and reflex examinations were all normal. (R. 258-59).

In August 2005, Plaintiff began treatment with John Honnigford, M.D. (R. 410). Plaintiff complained of daily back pain and poor daily function. Dr. Honnigford noted Plaintiff's history of asthma, obesity, and migraines. He said Plaintiff's last MRI was five years earlier and showed degenerative discs; he also noted sleep apnea. Dr. Honnigford observed Plaintiff had exceptionally poor hygiene, end expiratory wheezes, and trigger point tenderness. Dr. Honnigford assessed fibromyalgia, obesity, and asthma, as well as financial difficulties. He advised lifestyle changes and prescribed asthma medications, Zoloft, and weight loss.

In February 2006, Dr. Honnigford saw Plaintiff for complaints of difficulty sleeping.  (R. 473).  Dr. Honnigford diagnosed obesity and sleep apnea, advised weight loss and physical therapy, and prescribed medications.

On November 16, 2006, Dr. Honnigford wrote a letter about Plaintiff.  (R. 472).  He stated Plaintiff's impairments included chronic back pain, asthma, sleep apnea, depression, and morbid obesity with a body mass index ("BMI") of 62.  He also referred to Plaintiff's April 2000 MRI.  He noted a consulting neurosurgeon, Harold Cannon, M.D., would not perform surgery due to the high risk of recurrent disc herniation given Plaintiff's body habitus.  (*Id.*)

Dr. Honnigford said Plaintiff had been treated with pain medication.  He also said Plaintiff used an Advair Disk Inhaler and daily breathing treatments for severe asthma, and that she was undergoing treatment (including with Paxil) for depression, anxiety, and borderline personality disorders.  (*Id.*)  Dr. Honnigford said that Plaintiff was limited in daily activities due to chronic back pain and morbid obesity.  He said Plaintiff was "unable to sit or stand for more than 30 minutes without having to lie down or elevate her feet."  He said shortness of breath limited her physical activities and she required frequent breaks to catch her breath with even minimal exertion.  Dr. Honnigford opined that Plaintiff's mental impairments combined with chronic pain affected her concentration and ability to complete tasks.  He further opined that, "[d]ue to the frequency of respiratory infections, back pain and mental impairments, it [was] likely that

[Plaintiff] would miss 3-5 days per month if she attempted to work on a full time basis." (*Id.*)

### 6. Consultative Evaluations

On December 7, 2001, Plaintiff underwent a medical evaluation with consultative physician William S. Mullican, M.D., in connection with her claim for benefits. (R. 202-05). Plaintiff reported seven to eight years of back pain with radiation down the lateral aspect of the right leg. (R. 202). Dr. Mullican noted Plaintiff had asthma but reported no problems with dyspnea or cough and had normal breath sounds with no wheezing. (R. 202-03). Plaintiff had normal fine motor movements of the hands, full grip strength, and full muscular strength throughout. (R. 204). She had a normal gait and station and walked without an assistive device; she could walk on heels and toes and tandem walk without apparent difficulty. The straight-leg-raising sign was negative bilaterally, and reflexes were normal throughout. Dr. Mullican noted that Plaintiff was 4 feet 11 inches tall and weighed 253 pounds. (R. 203). Dr. Mullican said Plaintiff's mental status was alert and oriented, with normal intelligence and no abnormal thought processes noted; he noted no psychiatric problems. (R. 203-04). He diagnosed **exogenous obesity (meaning obesity caused by overeating)**, degenerative disc disease, and history of bronchial asthma. (R. 204).

On June 19, 2004, Plaintiff underwent evaluation with physician Brian Atwood, M.D., in connection with her claim for benefits. (R. 342-43). Plaintiff

reported having shortness of breath with any activity and at rest.  (R. 342).  She

reported not smoking for the previous three years.  (*Id.*)  She said she went to the

ER for breathing difficulties about every month.  Dr. Atwood reviewed an MRI

that showed several herniated discs and noted Plaintiff could lift about 30

pounds.  (*Id.*)  Plaintiff said she occasionally used a wheelchair.  (*Id.*)  Dr. Atwood

observed Plaintiff had a normal gait and posture without assistive devices and

had no obvious dyspnea or fatigue getting on or off the examination table.  (R.

342-43).  Plaintiff's lungs were clear with no wheezes.  (R. 343).  Plaintiff was 4

feet 11 inches tall and weighed 280 pounds.  (R. 342).  Plaintiff was able to walk

on heels and toes, tandem walk, hop, squat, and rise from a seated position

without difficulty.  (R. 343).  She had a normal speed, sustainability, and

stability.  Dr. Atwood found no musculoskeletal deformities, pain, swelling, or

inflammation.  Straight leg raising was negative.  Plaintiff's muscle strength was

full and symmetrical throughout; deep tendon reflexes were normal, equal and

symmetric; and gross movement and fine finger manipulation was normal.  Dr.

Atwood found no limitation in Plaintiff's ranges of motion.  (R. 344).  Dr. Atwood

opined Plaintiff could walk and stand for two hours in an eight-hour day and

said he did not see any limitation in Plaintiff's ability to stand, walk, lift, and

carry, but noted she may have asthma difficulty if required to perform strenuous

activity or be surrounded by environmental exposures.  (R. 343).

      On July 12, 2004, Plaintiff underwent evaluation with consultative

psychologist Severin G. Wellinghoff, Ph.D., in connection with her claim for

benefits.  (R. 345-49).  Plaintiff complained of problems with mood swings and stress.  (R. 347).  Plaintiff said she left her last job at a motel due to her back and anger.  (R. 348).  Plaintiff reported good interpersonal relations with family and a friend.  (R. 346).  Plaintiff cared for her personal needs with occasional assistance from her husband.  (R. 349).  Her daily activities included cooking, and she shopped in a wheelchair.  Plaintiff enjoyed reading, playing cards, and watching movies.  (R. 348).

Dr. Wellinghoff noted Plaintiff was not taking any psychotropic medication. (R. 346, 348).  Plaintiff denied using any street drugs, but drank occasionally. (R. 348).  Her mental trend and thought content were normal, her speech was relevant and coherent, and she was cooperative with a full affect and a good ability to interact.  (R. 346, 348-49).  Her judgment, insight, and recent memory were fair; her remote memory was good.  (R. 348).  Dr. Wellinghoff said Plaintiff's comprehension and memory were fair to good, and her judgment was fair; he concluded she was able to do things in a complex way most of the time and could complete tasks if her back was not hurting.  (R. 349).  Dr. Wellinghoff assessed that Plaintiff had depressive disorder, anxiety disorder, with mood/bipolar disorder to be ruled out.  He rated her GAF as 52, indicative of moderate symptoms or difficulty in functioning.  (*Id.*)

### 7.  State Agency Medical Opinions

In February 2002, state agency physician J. Corcoran, M.D., reviewed the record and assessed that Plaintiff could lift and carry up to ten pounds

frequently and 20 pounds occasionally, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday.  (R. 175-82).  Dr. Corcoran opined Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl (R. 177), and that she had to avoid concentrated exposure to temperature extremes, wetness, and humidity, and avoid even moderate exposure to irritants such as fumes, odors, dusts, gases, and poor ventilation.  (R. 179).

On March 26, 2002, state agency psychologist F. Kladder, Ph.D., reviewed the record and concluded that Plaintiff did not have a medically determinable mental impairment.  (R. 184).

On August 30, 2004, state agency psychologist J. Gange, Ph.D., reviewed the record and concluded that Plaintiff had a severe mental impairment(s) which mildly restricted her activities of daily living and moderately limited her social functioning and concentration, persistence, or pace, but caused no episodes of decompensation.  (R. 159-69).  Dr. Gange then assessed Plaintiff's ability to perform work-related mental activities.  (R. 155-57).  Dr. Gange opined that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors.  (R. 155-56).  Dr. Gange found no significant limitations in 15 other work-related activities, and, further, no evidence of any limitation in Plaintiff's ability to get along with co-workers and peers without

undue distraction.  (R. 156).  Dr. Gange said that Plaintiff had moderate activities of daily living and that, while she might prefer to avoid contact with the public, she retained the ability to complete simple, repetitive tasks.  (R. 157).  On December 2, 2004, state agency psychologist B.R. Horton, Psy.D., reviewed the record and affirmed Dr. Gange's assessment.  (*Id.*)

On August 31, 2004, state agency physician J. Corcoran, M.D., again reviewed the record and assessed essentially the same limitations, i.e., that Plaintiff could perform a range of light work with only occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and with avoidance of concentrated exposure to temperature extremes, wetness, humidity, and irritants such as fumes, odors, dusts, gases, and poor ventilation.  (R. 147-54).  Dr. Corcoran reviewed the evidence upon which Plaintiff's limitations were based, including her height/weight/BMI, history of asthma, degenerative disc disease, and back pain.  (R. 148).  On January 4, 2005, J. Gaddy, M.D., reviewed the evidence in the record and affirmed Dr. Corcoran's assessment.  (R. 154).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes

that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant

numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during

steps one through four, and only after Plaintiff has reached step five does the

burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.

2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through June 30,

2003, and Plaintiff had not engaged in substantial gainful activity since the

alleged onset date.  (R. 18).  The ALJ continued by finding that, in accordance

with 20 C.F.R. § 404.1520, Plaintiff had seven severe impairments:  degenerative

disc disease; asthma; sleep apnea; obesity; anxiety; depression; and a

personality disorder.  (*Id.*)  The ALJ concluded that these impairments did not

meet or substantially equal any of the impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (R. 19).  Additionally, the ALJ opined that Plaintiff's

allegations regarding the extent of her limitations were not fully credible.  (R. 20).

Consequently, the ALJ concluded that Plaintiff retained the RFC for sedentary

work with lifting and carrying up to ten pounds frequently and occasionally;

standing/walking two hours in an eight-hour workday; sitting for six hours;

occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching

and crawling; no climbing of ladders/ropes/scaffolding; no exposure to extreme

heat, cold, wetness, humidity, fumes, odors, dusts, gases, or poor ventilation; no

contact with the general public; and only occasional contact with co-workers/

supervisors.  (R. 19).  The ALJ, therefore, opined that Plaintiff did not retain the

RFC to perform her past work.  (R. 22).  The ALJ determined that Plaintiff still could perform a significant number of jobs including 3,000 assembler, 1,400 inspector, and 1,000 order clerk jobs.  (R. 23).  The ALJ concluded by finding that Plaintiff was not under a disability.  (*Id.*)

## VI.  Issues

The court concludes that Plaintiff has essentially raised six issues. However, the court notes one overriding issue that precludes a finding of disability and renders those six issues moot:  the ALJ reasonably found Plaintiff had failed to follow prescribed treatment, and such a finding means that Plaintiff is not disabled.  The issues raised by Plaintiff are as follows:

1.  Whether the ALJ conducted an improper RFC determination.

2.  Whether the ALJ failed to ask proper hypothetical questions to the VE.

3.  Whether the ALJ failed to address favorable medical evidence.

4.  Whether the ALJ failed to consider Plaintiff's obesity.

5.  Whether the ALJ's credibility determination was patently wrong.

6.  Whether the ALJ failed to consider the effects of Plaintiff's medications.

**A:  Is the ALJ's finding that Plaintiff failed to follow prescribed treatment supported by substantial evidence?**

The court notes that the ALJ in this case clearly and unequivocally determined that Plaintiff failed to follow prescribed treatment.  The ALJ's decision provides as follows:

The undersigned notes that when the claimant was evaluated by neurosurgeon H. Cannon, M.D., on June 1, 1998, her weight was only 234 pounds.  Dr. Cannon refused to perform back surgery unless the claimant lost about 25 pounds.  Instead of losing weight, the claimant has steadily gained weight to over 300 ponds in 2006 (claimant weighed 302 pounds during sleep center testing on June 8, 2006 (Ex. 20F1)).

The claimant's non-compliance with recommended treatment also extends into her respiratory problems which significantly limit her ability to function according to her testimony.  Although the claimant has reported on numerous occasions that she no longer smokes, the evidence indicates that she does continue to smoke cigarettes as well as marijuana.  These factors further impact negatively upon the claimant's credibility regarding the severity of her impairments as her actions amount to noncompliance.  See 20 CFR 404.1530 and 416.930.  While not a factor to negate a finding of disability, noncompliance is [a] credibility factor.

(R. 21).  The ALJ, therefore, indicated, with this evidence and by citing the appropriate section of the Code of Federal Regulations, that he had determined that Plaintiff was noncompliant.  While the ALJ claims that noncompliance is "not a factor to negate a finding of disability," the regulations governing SSI and DIB provide otherwise.  20 C.F.R. § 404.1530, which deals with disability insurance benefits, explains the consequences of an individual's noncompliance:

(a)  What treatment you must follow.  In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.

(b)  When you do not follow prescribed treatment.  If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits.

(c)  Acceptable reasons for failure to follow prescribed treatment.  We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language)

-18-

when determining if you have an acceptable reason for failure to follow prescribed treatment.  The following are examples of a good reason for not following treatment:

> (1)  The specific medical treatment is contrary to the established teaching and tenets of your religion.
>
> (2)  The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
>
> (3)  Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
>
> (4)  The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5)  The treatment involves amputation of an extremity, or a major part of an extremity.

20 C.F.R. § 404.1530.  The SSI counterpart, 20 C.F.R. § 416.930, employs similar language regarding noncompliance.

Whether or not these standards were discretionary or mandatory was resolved by the Seventh Circuit when it explained in *Ehrhart* that "[t]he Secretary may not find total disability when a claimant inexcusably refuses to follow a prescribed course of medical treatment that would eliminate his total disability." *Ehrhart v. Secretary of Health and Human Services,* 969 F.2d 534, 538 (7th Cir. 1992).  Judge John Daniel Tinder, then a U.S. District Judge in this district, concluded that this meant that an ALJ who determined that an individual was

noncompliant must also find that individual not disabled.  *Blue v. Apfel*, 2001 WL 1112669 at *5 (S.D. Ind. 2001).

Because the ALJ in this case found Plaintiff noncompliant, Plaintiff was not entitled to DIB or SSI.  Our only task is determining if the ALJ's finding of noncompliance is supported by substantial evidence.  The medical evidence in this case does support the ALJ's determination of noncompliance.  Plaintiff was explicitly instructed in 1998 by Dr. Cannon that in order to perform back surgery she needed to lose approximately 25 pounds.  (R. 432).  Dr. Cannon warned of the risks of failing to lose weight, explaining that she risked recurrent disc herniation based on her body habitus, and that she needed to lose the weight immediately.  (*Id.*)  On December 7, 2001, consultative examiner Dr. Mullican observed that Plaintiff's obesity was caused by overeating (R. 204), and Plaintiff has pointed to no other evidence in the record which indicates that Plaintiff was unable to lose weight because of some condition beyond her control.  Plaintiff has provided no evidence that she lost the weight necessary to undergo surgery or that the surgery would not have relieved her back pain.

As for Plaintiff's breathing problems/asthma, there was also evidence of noncompliance.  She was advised in June 2003 to avoid cigarette smoke.  (R. 387).  On June 19, 2004, Dr. Atwood indicated that Plaintiff would have asthma difficulties if "surrounded by environmental exposures."  (R. 343).  Despite these warnings, in December 2005, Plaintiff tested positive for marijuana and had

cigarettes in her purse.  (R. 464).  On September 14, 2006, Plaintiff admitted to smoking one-and-a-half packs of cigarettes a day.  (R. 436).  This was clearly the picture of an individual who was not complying with medical advice.[3]  As there is evidence in the record to support the ALJ determination that Plaintiff was noncompliant, both in treatment for her asthma and back pain, the court concludes that the ALJ's decision on noncompliance is supported by substantial evidence.  Pursuant to the Code of Federal Regulations and the Seventh Circuit's decision in *Ehrhart*, the ALJ was obligated to find that Plaintiff was not disabled, and, therefore, not entitled to SSI or DIB benefits.

**B.     The six issues raised by Plaintiff are moot.**

Because Plaintiff failed to follow prescribed treatment, the Social Security Administration must find her not disabled, and all remaining issues are moot.

## VII.  Conclusion

Substantial evidence supports the ALJ's determination that Plaintiff was noncompliant with her doctors' requests to lose weight and to avoid cigarette

---

[3]While not a portion of the ALJ noncompliance determination, the court also notes that Plaintiff claimed that use of her CPAP machine was not helpful.  However, the medical records indicate that when Plaintiff used a CPAP machine her apnea hypopnea was reduced to 2.7 per hour of sleep and her oxygen saturation was well maintained.  (R. 468).  Her claim that her sleep apnea was not improved with use of the CPAP machine calls into question her compliance in this area as well.

smoke.  Consequently, Plaintiff was not under a disability at the time of the

ALJ's decision.  The final decision of the Commissioner is, therefore, **AFFIRMED**.

     **SO ORDERED** the 20th day of March, 2009.

                                       WILLIAM G. HUSSMANN, JR.
                                          Magistrate Judge

**<u>Electronic copies to</u>:**

J. Michael Woods
WOODS & WOODS
mwoods@woodslawyers.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov